**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| CYNTHIA A. BORGARD | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:11CV783 JCH |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the Commissioner's final decision denying Cynthia Borgard's ("Borgard") application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq*.  Borgard alleges physical disability due to fibromyalgia, pinched nerves, degenerative joint disease, osteoarthritis, and plantar fasciitis.  (Tr. 138.)  Borgard filed a Brief in Support of the Complaint. [Doc. 11.]  The Commissioner filed a Brief in Support of the Answer.  [Doc. 14.]

**I.  Procedural History**

On March 26, 2009, Borgard filed an application for disability insurance benefits.  She alleged that the onset date of disability was February 9, 2009.  (Tr. 113-120.)  The Social Security Administration denied Borgard's claim (Tr. 65-70.) and she filed a timely request for a hearing before the Administrative Law Judge ("ALJ").  (Tr. 72-73.)  Borgard testified at a hearing before the ALJ on January 27, 2010. (Tr. 22-61.)  The ALJ issued a written decision on March 3, 2010 affirming the denial of benefits.  (Tr.12-18).  On April 9, 2010, Borgard filed a

request for review with the Appeals Council.  (Tr. 8.)  On April 13, 2011, the Appeals Council

denied this request.  (Tr. 1-3.)  The ALJ's decision thus stands as the final decision of the

Commissioner.  Borgard filed this appeal on May 3, 2011.

## II.  Administrative Record

### A.  Testimony before the ALJ

The ALJ held a hearing on January 27, 2010.  (Tr. 12, 22.)  Borgard was represented by

counsel at the hearing.  Borgard and a vocational expert, Delores Gonzales ("VE") testified at the

hearing.

### 1.  Borgard's Testimony

Borgard testified that she has a college education with degrees in accounting and heating

and cooling.  (Tr. 27, 55.)  She stated that she can read, though she has difficulty focusing

because of her eyesight.  (Tr. 27.)  She also stated that she can write, but has difficulty doing so

because problems with holding a writing instrument for any length of time.  (Tr. 28.)  Borgard

further testified that she could perform simple arithmetic.  (Tr. 27-28.)  At the time of the hearing

Borgard's husband was unemployed.  (Tr. 28.)  She and her husband continued to receive health

insurance through an extension from the Plumber's and Pipefitter's Union.  (Tr. 28-29.)  She

lives with her husband, her stepson, and her stepson's fiancée in a two-story house.  (Tr. 26-27.)

Borgard stated she was last employed in February 2009.  (Tr. 29.)  Bogard stated that her

medical problems that impact her working include (1) hernia, (2) degenerative disc disease,

(3) mild scoliosis, (4) mild disc bulge in her neck, (4) osteoarthritis in her knees, (5) arthritis in

her feet (6) plantar faciatis, and (7) fibromyalgia.  (Tr. 39-44.)

Plaintiff testified about numerous jobs she held between 1994 and 2009, the alleged onset

date of disability.  First, Borgard worked at Robert Brophy's Place as a snack bar attendant. (Tr.

38.)  Borgard worked at A.G. Edwards & Sons, Inc. doing reports and balancing accounts.  (Tr. 38.)  She also worked at the Jefferson County Clerk's Office where she made copies.  (Tr. 38.)

Next, Borgard worked at Grand Oaks Heating and Cooling repairing heating and cooling units.  (Tr. 37-38.)  Borgard then worked at MetLife.  (Tr. 37.)  Then, she worked at apartment complexes performing maintenance work.  Borgard worked for the Catholic Youth Council as a counselor.  (Tr. 36-37.)  Then, Bogard worked at Dial Heating and Cooling as a dispatcher.  (Tr. 36.)  She served as a school bus driver for Hillsboro School District and Crabtree Harman Corporation.  (Tr. 36.)  Next, Borgard worked for R.H. Zeffert and Associates, Inc. where she gathered information about utility allowances in apartment complexes for low income individuals. (Tr. 35-36.)

Then, Borgard worked at Grand Mesa Eggs, Inc. evaluating the egg inventories for grocery stores and conducting reports about egg production on farms.  (Tr. 34.)  Borgard next worked at Convergys Customer Management Group, Inc., as a customer service representative.  (Tr. 33-34.)  Subsequently, Borgard worked for Schneider Service Company in St. Louis as a dispatcher.  (Tr. 33.)  Next, Borgard worked for a Foerster's Machining Company, where she was involved in shipping and receiving auto parts.  (Tr. 32.)

Next, Borgard worked for All Climate Services, Inc. doing invoices and other paperwork.  (Tr. 32.)  Then, she worked as a team leader at Lowe's Home Improvement, where she supervised and managed employees in the tool department.  (Tr. 30.)  Finally, Borgard worked for MetLife where she entered data for insurance claims.  (Tr. 29-30.)  Bogard worked at MetLife until she stopped working in February 2009.

Next, Borgard testified about her physical abilities.  She testified that she can no longer sew or go grocery shopping by herself.  (Tr. 46-47.)  She stated, however, that she is able to do

3

housework and cook on occasion.  (Tr. 45-46.)  She also testified that she does the laundry, loads her dishwasher, and, every once in a while, vacuums.  (Tr. 46.)  Moreover, she testified that she still feeds the dog even though her husband has taken over watering and bathing it.  (Tr. 46-47.) She also testified that she can reach over her head, though not to the full extent that she once could and it causes her some pain.  (Tr. 49.)  Additionally, she stated that she can pick up small items, such as a pen or piece of paper, though she said she had a tendency to drop things. (Tr. 49-50.)  She also stated that she can stand for ten to fifteen minutes, sit for only fifteen to twenty minutes, and walk ten to fifteen minutes before resting.  (Tr. 49.)

Then, Bogard testified regarding her assessment of her pain levels.  Borgard rated the pain in her back as five on scale of one to ten, with ten being the most severe; but, on days when she "tweaks" it, the pain can be a nine or ten.  (Tr. 50.)  She rated the pain in her knees as a five on a scale of one to ten (Tr. 51.); the pain in her feet and shoulders as a six out of ten (Tr. 51-52.); the pain in her hands as a three out of ten (Tr. 51.); and the pain in her hips as a three or four out of ten.  (Tr. 51.).  Borgard also testified about her reduced kidney functions and the fact that this condition causes her to use the bathroom between 20 and 30 times a day, which she stated she did not feel an employer would easily accommodate.  (Tr. 52-53.)

## 2.  VE Delores Gonzales's Testimony

The VE testified that Borgard's work, during the relevant time period, as a retail sales clerk[1] and general office clerk were light, semi-skilled[2] work.  (Tr. 55-56.)  Additionally, she testified that Borgard's work as an accounting clerk, general office clerk, dispatcher, and customer service representative were all classified as sedentary, semi-skilled work. (Tr. 56.)

---

[1] This work is based on Borgard's job at Lowe's Home Improvement. The VE divided the job into two different areas, retail sales and stocker. The VE classified the stocker work as heavy and did not discuss it further. (Tr. 55-56.)
[2] The VE stated that the skills that Borgard could use in other jobs included accounting, bookkeeping, sales, customer service, and clerical skills.  (Tr. 56.)

The ALJ posed four hypotheticals to the VE. First, the ALJ asked the VE whether an individual of Borgard's education, training, and work experience, could perform Borgard's past work with the following restrictions: (1) light work; (2) overhead reaching limited to frequently; (3) fingering and fine or fingering and gross manipulation limited to frequently.  (Tr. 56.)  The VE testified that such an individual would be able to work Borgard's past jobs as a customer service representative, dispatcher, general office clerk, and accounting clerk.  (Tr. 57-58.)

Second, the ALJ asked the VE whether, using the same restrictions as in hypothetical one, an individual would be able to perform Borgard's past work if it were limited to sedentary work and the individual has two jobs. (Tr. 58.)  The VE responded that such an individual would be able to perform Borgard's past work as a customer service representative and accounting clerk.  (Tr. 58-59.)

Third, the ALJ asked the VE whether, using the same restrictions as in hypothetical two, an individual would be able to perform Borgard's past work if the individual also needed the following restrictions:  (1) routine overhead reaching limited to occasionally and (2) handling and gross manipulation limited to occasionally.  (Tr. 59.)  The VE answered that such an individual would be able to perform Borgard's past work as a customer service representative and dispatcher.  (Tr. 59-60.)

Fourth, the ALJ asked the VE whether, using the same restrictions as in hypothetical three, an individual would be able to perform Borgard's past work if the individual also needed at least two breaks in excess of the normal two breaks and lunch hour per day.  (Tr. 60.)  The VE responded that such an individual would not be able to perform any of Borgard's past work or any work.  (Tr. 60.)  Borgard's attorney did not question the VE.  (Tr. 61.)

**B.  Medical Records**

On September 2, 2005, James Speiser, M.D. took an x-ray of Borgard's lumbosacral spine after Borgard indicated that she had acute lumbar pain. Based on the x-ray, Dr. Speiser concluded that Borgard had mild dextroscoliosis and disc narrowing in L3, L4, and L5 interspaces. (Tr. 164, 366.)

On August 1, 2006, Dr. Speiser ordered an MRI of Borgard's lumbar spine due to complaints of low back and bilateral buttock pain. Based on the MRI, Dr. Speiser concluded that Borgard had disc desiccation involving L2 through L5. The MRI also revealed left lateral disc herniation at L5 which exited proximally against the left S1 nerve root. (Tr. 165, 378.)

On February 15, 2008, Dr. Speiser treated Borgard for plantar fasciitis and osteoarthritis in her back, knees, and elbows. Dr. Speiser noted that Borgard was experiencing a lot of back pain after a day at work. He further noted that she had stopped regular exercise and had felt worse since stopping. He diagnosed her with sciatica and gave Borgard "controlled home exercises" and medication for treatment. Dr. Speiser also diagnosed her with degenerative joint disease in her spine and elbows. (Tr. 267.)

On February 16, 2008, Dr. Elizabeth Huck, D.O. ("Huck") performed a routine x-ray of Borgard's chest.  Dr. Huck also noted that Borgard's lung fields had remained hyper-inflated, which she first noticed on January 20, 2007. (Tr. 230.)

On March 21, 2008, Dr. Speiser treated Borgard for pain in her left hand. Dr. Speiser stated that her left hand was "completely normal" from what he could see. Borgard's joints were not swollen, she had no tenderness, and her grip strength was "excellent." (Tr. 266.)

On March 24, 25, and 27, 2008, Dr. Speiser's office called Borgard regarding lab results from her appointment on March 21, 2008. Dr. Speiser noted that her kidney functions were slightly worse than previously and that all other labs were stable. (Tr. 280.)

On April 29, 2008, Dr. Edward Reh, M.D. ("Dr. Reh") examined Borgard after she complained of pain on the right side of her neck. Additionally, Dr. Reh's treatment notes indicate that she also complained of abdominal pain and nausea. (Tr. 223, 318.)

On April 30, 2008, Dr. Reh took an ultrasound of Borgard's gallbladder after she complained of pain in her upper abdominal region. Reh concluded that the results were normal. (Tr. 229.)

On May 2, 2008, Dr. Speiser treated Borgard for right upper quadrant abdominal pain and bloating. Speiser noted that Borgard had some tenderness in her upper right abdomen during the examination. He ordered a computerized tomography ("CT") scan of her abdominal region and prescribed Nexium. (Tr. 265, 362.) The CT revealed that Borgard's gallbladder was somewhat contracted, she had a mild hepatomegaly with no lesions, and she had no bowel obstruction or inflammation. (Tr. 363, 375.)

On May 5, 2008, Dr. Speiser's office called Borgard regarding lab results from her visit on May 2, 2008. Dr. Speiser noted that her kidney functions were slightly deceased, but stable. All other labs were normal. Later that day, Dr. Speiser's office again called Borgard regarding the results of her CT scan on May 2, 2008. Dr. Speiser noted that the CT revealed that the gallbladder was contracted and the liver was slightly enlarged. However, he could not determine any clear reason for her abdominal pain. He also noted that he gave her Dr. Costigan's name and instructed her to make an appoint.  (Tr. 278.)  That same day Dr. Reh took a hepatobiliary scan

of Borgard's upper abdominal region and an ultrasound of her gallbladder. Reh concluded that the results were normal. (Tr. 227-28, 323.)

On May 7, 2008, Dr. Reh examined Borgard's upper gastrointestinal after she complained of upper right quadrant abdominal pain. Reh found no abnormalities in her esophagus, stomach, or duodenum. (Tr. 226, 317.)

On May 12, 2008, Dr. Speiser's treatment notes show that he referred Borgard to Dr. Costigan. (Tr. 223, 318.)

On May 28, 2008, Dr. Speiser's treatment notes indicate that his office called Borgard on three occasions and left her messages telling her to schedule an appointment with Dr. Costigan. (Tr. 222, 224, 325.)  His notes further state that Borgard returned his call on May 28, 2008 and told him that she was no longer experiencing problems and did not wish to see Dr. Costigan at the time, though if her symptoms return she would schedule an appointment with him.  (Tr. 222, 224, 325.)

On June 18, 2008, Borgard called Dr. Speiser and reported that she was still experiencing abdominal pain. Dr. Speiser's treatment notes indicate that she never went to see Dr. Costigan, despite his recommendation on May 12, 2008 that she schedule an appointment with him. He again instructed her to call Dr. Costigan and make an appointment.  (Tr. 222, 224.)

On June 30, 2008, Dr. Costigan called Dr. Speiser to inform him that Borgard never showed up for her scheduled appointment. (Tr. 222, 224.)

On October 9, 2008, Dr. Speiser examined Borgard after she reported suffering from fatigue. Dr. Speiser noted that on Plaintiff's last visit, five months ago, she had a lot of abdominal pain but reported that at the time of her visit, the pain had gone completely away and not returned. Though Borgard complained of being drained of energy, Dr. Speiser found no clear

cause for fatigue.  Dr. Speiser also noted Plaintiff's past medical problems, including

degenerative arthritis lumbar spine, hyperlipidemia, chronic kidney disease, and hyperurcemia.

(Tr. 264, 361.)

On October 10, 2008, Dr. Speiser's office called Borgard regarding lab results that were

taken to try to evaluate the reason for Borgard's fatigue. The labs revealed that Borgard's renal

functions were decreased but were better than they had been in the past nine months, and that her

uric acid levels were borderline elevated but had also improved. Additionally, Borgard's thyroid

test was normal, as were her urine and blood counts. Dr. Speiser noted that the cause of her

fatigue was unclear and recommended a chest x-ray to examine whether a pulmonary process

was the cause. (Tr. 277, 339.)

On November 3, 2008, Borgard called Dr. Speiser concerning a rash that she had

developed. She told Dr. Speiser that she never saw Dr. Costigan. He prescribed medication for

the rash. (Tr. 222, 224.)

On February 10, 2009, Dr. Speiser examined Borgard regarding pain in her

neck. He noted a 20% decrease in flexion, extension, lateral rotation, and lateral flexion in the

neck. Additionally, he diagnosed Borgard with cervical nerve root compression down her

right arm, herniated disc at L5, and chronic kidney disease, stage III. (Tr. 263, 295, 360.)  Dr.

Speiser referred Borgard to Matthew Ruyle, M.D. for an MRI of her spine.  Based on the results,

Dr. Ruyle concluded that Borgard suffered from degenerative disc disease ("DDD") and

foraminal stenosis .  (Tr. 258-59, 283-84, 312-13, 353-54, 367-68, 376-77.)

On February 11, 2009, Dr. Speiser's office called Borgard regarding lab results from her

visit the previous day. Dr. Speiser stated that her kidney function had decreased, but was stable.

He prescribed medication to address the issue and gave treatment instructions.  Her cholesterol

and triglyceride levels were high and he prescribed simuvastatin.  All other lab results were normal.  (Tr. 276, 301, 337.)

On February 13, 2009, Dr. Speiser's office called Borgard to inform her about the results from her MRI on February 10, 2009. Dr. Speiser stated that she had multi-level degenerative joint disease in her neck, as well as mild pinching of the nerves on the left side of her neck at C3-4 and C3-5. However, he noted that her symptoms occurred in her right arm and neck, but the MRI revealed no pinched nerves her right side. (Tr. 275, 300, 336.)

On February 21, 2009, Dr. Huck performed a routine x-ray of Borgard's chest. No acute process noted. (Tr. 225, 316.)  Dr. Reh also saw Borgard and noted that her present medical problems included rheumatoid arthritis, osteoarthritis, hypertension, gastroesophagal reflux disease ("GERD"), herniated discs at L4-L5, degenerative joint disease, herniated disc, pinched neck nerve. Additionally, Dr. Reh examined Borgard and recommended that she exercise and eat a low-fat diet to reduce her weight.  (Tr. 233, 319.)

On February 27, 2009, Renee Amato ("Amato"), one of Dr. Speiser's staff members, examined Borgard after she had experienced an increase in pain in her joints and feet. Amato noted that Borgard had a decrease in range of motion of her neck, with extension limited to approximately 30 degrees. Amato added cyclobenzaprine to Borgard's medication and warned her that it would likely make Borgard tired. Amato also suggested that Borgard roll a tennis ball under her feet to help with pain from plantar fasciitis. (Tr. 262, 294, 359.)

On March 10, 2009, Rhonda Jones, D.C. completed a Functional Capacity Questionnaire (Physical) regarding Borgard. She assessed that Borgard could stand or walk for 0-4 hours and sit for 0-2 hours. She further assessed that Borgard could lift less than 10 lbs. frequently, but could rarely lift any weight more than that. Additionally, Dr. Jones assessed that during an 8-

hour workday Borgard could: frequently perform fingering tasks; occasionally perform handling tasks; and rarely perform tasks involving grasping, stooping or bending, or crouching. Moreover, Dr. Jones estimated that Borgard's pain would frequently interfere with her attention and concentration at work, and that Borgard would likely miss more than 4 days of work per month because of her impairments or treatments. (Tr. 240.)

On April 14, 2009, Amato performed a follow-up examination regarding Borgard's joint pains, specifically in her hip and knees. (Tr. 260-61, 292-93, 357-58.)  Amato noted that Borgard was hesitant about steroid injections for her joint pain because of a bad experience with steroid injections in her spine.  (Tr. 260, 292, 357.)  Amato also recorded that Borgard could make 100% of a fist, but only had 50% expected grip; however, she did not observe any swelling of the joints. (Tr. 260, 292, 357.)

On April 15, 2009, Dr. Speiser's office called Borgard regarding lab work done during her visit on April 14, 2009. Based on the lab results, Dr. Speiser diagnosed Borgard with pre-diabetes and instructed her to follow a diabetic diet and exercise 30 minutes on most days to try to lose weight. He also noted that her kidney functions had slightly decreased, but were stable. (Tr. 274, 298, 334, 335.)

On April 16, 2009, Dr. Speiser ordered an x-ray of Borgard's bilateral knees after she complained of joint pain during her April 14, 2009 appointment. The x-ray revealed mild narrowing of the medial compartments in both knees. (Tr. 296, 364.)  Dr. Speiser's office then called Borgard to inform her of the results. Dr. Maura Speiser noted that the x-ray showed mild osteoarthritis bilaterally in her knees and that steroid injections in the knees might help with her pain. (Tr. 297, 333, 381.)

On June 12, 2009, Dr. Speiser's office called Borgard regarding labs taken during a previous visit. Dr. Speiser noted that her cholesterol was excellent and that she should continue with current medications, diet, and exercising.  (Tr. 332.)

On August 10, 2009, Dr. Speiser treated Borgard for cervical spinal stenosis, arthritis in her knees, and plantar fasciitis. He noted that Borgard needed to see an orthopedic spine specialist for her stenosis and a specialist for her plantar fasciitis. He made recommendations for both. Additionally, Dr. Speiser stated that the arthritis in her knees was stable, but Borgard declined steroid injections for her knees. (Tr. 355-56.)

On March 23, 2010, Dr. Speiser ordered an MRI of Borgard's lumbar spine after she complained of back pain. The MRI revealed disc bulging. Specifically, there was asymmetrical bulging at L3-4 level resulting in a mild to moderate impression upon the adjacent thecal sac, as well as mild to moderate narrowing of the left L3-4 foramina. Additionally, the MRI revealed small to moderate disc herniation at L5-S1 which was impressing upon the adjacent thecal sac and left S1 nerve root. There was also mild to moderate foraminal narrowing on the left at L5-S1. (Tr. 380.)

On July, 29 2010, Naseem A. Shekhani, M.D., P.C., examined Borgard and noted bilateral tarsal tunnel syndrome and possible L5-S1 radioculopathy.  (Tr. 218.)

### III.  ALJ Decision

The ALJ determined that Borgard had not engaged in substantial gainful activity since the onset date of her disability on February 9, 2009.  (Tr. 16.)  The ALJ found that she had several severe impairments: "degenerative joint disease of the cervical spine with stenosis, degenerative arthritis of the lumbar spine, and osteoarthritis of the knees."  (Tr. 14.)  However, the ALJ determined that Borgard did not have an impairment or combination of impairments that

met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 16.)  Further, the ALJ found that Borgard has the residual functional capacity ("RFC") to "perform sedentary work … except reaching overhead and handling/gross manipulation are limited to frequently and not constantly."  (Tr. 16.)  The ALJ found that these restrictions would allow Borgard to pursue her previous employment as a customer service insurance representative, accounting clerk, and customer service representative. Additionally, the ALJ determined that Borgard was not under a disability as defined by the Social Security Act, at any time through March 3, 2010.  (Tr. 17.)  The ALJ found that Borgard's allegations of impairments were not credible.  (Tr. 17.)

## IV.  Legal Standard

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001).  Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion.  *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000).  As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently.  *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).  In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000) (quoting *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999)).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole to consider:

(1)     the credibility findings made by the Administrative Law Judge;

(2)     the education, background, work history, and age of the claimant;

(3)     the medical evidence from treating and consulting physicians;

(4)     the plaintiff's subjective complaints relating to exertional and non-exertional impairments;

(5)     any corroboration by third parties of the plaintiff's impairments; and

(6)     the testimony of vocational experts when required which is based upon a proper hypothetical question.

*Brand v. Secretary of Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defied in the social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a).  In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five-step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity.  If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities.  If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P,

14

Appendix 1.  If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work.  If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy.  If not, the Commissioner declares the claimant disabled.  20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence.  *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984).  The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole.  *See, e.g., Battles v. Sullivan*, 992 F.2d 657, 660 (8th Cir. 1990).  In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the objective medical evidence; (2) the subjective evidence of the duration, frequency, and intensity of plaintiff's pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the dosage, effectiveness and side effects of any medication; and (6) the claimant's functional restrictions.

*Id.* at 1322.

## V.      Discussion

Borgard alleges four points of error in the ALJ's decision.  First, Borgard states that the ALJ failed to properly consider the opinion evidence of treating chiropractor, Rhonda L. Jones, D.C.  Second, Borgard asserts that the ALJ failed to develop the record by re-contacting her treating physician Dr. Speiser for an opinion.  Third, Borgard contends that the ALJ failed to consider fatigue from medication side effects and chronic kidney disease as severe medically determinable impairments.  Finally, Borgard asserts that the ALJ's decision is contrary to the weight of the evidence currently of record.  The Commissioner contends that decision of the ALJ is supported by substantial evidence on the record as a whole.

## A.      Opinion Evidence of Chiropractor

Borgard asserts that the ALJ failed to give proper consideration to the opinion of her treating chiropractor, Rhonda Jones.  Bogard contends that the ALJ should have considered the opinion of Dr. Jones to determine the severity of Bogard's impairments and how the impairments affect her ability to function, as required in Social Security Ruling (SSR) 06-03p.   The Commissioner asserts that the ALJ's assessment complied with SSR 06-03p.

> Social Security separates information sources into two main groups: *acceptable medical sources* and *other sources*.  It then divides *other sources* into two groups: *medical sources* and *non-medical sources*.   20 C.F.R. §§ 404.1502, 416.902 (2007).   *Acceptable medical sources* include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists. 20 C.F.R. §§  404.1513(a), 416.913(a) (2007).   According to Social Security regulations, there are three major distinctions between acceptable medical sources and the others: (1) Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment, *id.,* (2) only acceptable medical sources can provide medical opinions, 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2007), and (3) only acceptable medical sources can be considered treating sources, 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007).

*Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007) (emphasis in original). Medical sources include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists."  20 C.F.R. § 404.1513(d)(1). "Information from these other sources cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an "acceptable medical source" for this purpose."  SSR 06-03P, 2006 WL 2329939.  "[I]nformation from such other sources, [however], may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.  *Id.*; 20 C.F.R. § 404.1513(d).  A severe impairment is defined as one which significantly limits the claimant's physical or mental ability to do basic work activities.  *See Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (quoting 20 C.F.R. § 404.1520(c)).   "The case record should reflect the consideration of opinions from medical sources who are not 'acceptable medical sources . . .who have seen the claimant in their professional capacity."  SSR 06-03p.

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

> SSR 06-3p.

In the ALJ's decision, he noted that the administrative record shows that Dr. Jones has treated Borgard since 1996.  (Tr. 16, 240.)  The ALJ also noted that Dr. Jones completed a Physical Functional Capacity Questionnaire for Borgard on March 10, 2009, and at that time, she was treating Borgard every two months.  (Tr. 16, 240.)   The ALJ recounted Dr. Jones's responses to the questionnaire, which opined that in an eight hour workday, Borgard could stand

or walk from zero to four hours and sit from zero to two hours.  (Tr. 16, 240.)  The ALJ determined that while Dr. Jones's opinion was considered and was the only source stating Borgard could not sustain any work activity, her opinion was not an acceptable medical source for establishing one's disability status.  (Tr. 16.)  The ALJ's opinion also details the evidence that supports a finding that Borgard is not disabled.

The Court finds that the ALJ's analysis met the requirements listed in SSR 06-03p.  The ALJ's opinion provided a summary of Dr. Jones's opinion regarding Borgard's physical limitations and acknowledged that the opinion had to be considered.  (Tr. 16.)  The ALJ's opinion also provided a detailed analysis of the medical records, including the records of Dr. Speiser, Borgard's treating physician.  (Tr. 15-17.)  The ALJ's decision shows that the ALJ determined that the substantial evidence in the record demonstrated that Borgard was not disabled.  Based upon the ALJ's analysis, it is clear that the ALJ found that Dr. Jones's opinion conflicted with the other evidence in the record as a whole.  Because Dr. Jones's opinion was not an acceptable medical source opinion and not entitled to controlling weight, the ALJ's consideration of Dr. Jones's opinion in light of the acceptable medical source evidence and record as a whole was sufficient.

## B.    Duty to Develop the Record in Determination of the RFC

Next, Borgard asserts that the ALJ's RFC decision is not supported by substantial evidence because the ALJ failed to develop the record by seeking a "work-related opinion" from Dr. Speiser.  The RFC is a medical question.  *Eichelberger*, 390 F.3d 584, 591 (8th Cir. 2004).  It is true that "[a] disability claimant has the burden to establish her RFC."  *Id.* (citing *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).  However, the ALJ has an independent duty to develop the record despite the claimant's burden.  *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th

Cir. 2004). "Some medical evidence must support the determination of the claimant's RFC." *Eichelberger*, 390 F.3d at 591 (citing *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000)) (internal quotation marks omitted). "[T]he ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'" *Id.* (quoting *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2003)).

The Court believes that the ALJ's decision was supported by substantial evidence. In *Eichelberger*, the court found that substantial evidence supported the ALJ's denial of benefits at step four where the claimant's subjective complaints had been discredited, no physician had placed significant work-related limitations on the claimant, and treatment notes indicated that the claimant's had good strength in her shoulder. *Id.* at 591. Here, Borgard's subjective complaints have been discredited, no physician has placed work-related limitations on her, and her treatment records show that she failed to visit the orthopedic specialist as recommended by her doctor. (Tr. 15-17.) Borgard's test results consistently show normal lab results. (Tr. 15-17.) And, as the burden to show she could not perform her past relevant work was on Borgard, therefore, the adverse determination was a failure to carry that burden instead of a failure to develop the record. *See Eichelberger*, 390 F.3d at 592.

**C.     Severe Medically Determinable Impairment**

Borgard contends that the ALJ failed to consider fatigue from the side effects of her medication and chronic kidney disease as a severe medically determinable impairment. "Step two [of the five-step] evaluation states that a claimant is not disabled if his impairments are not 'severe.'" *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) (citing *Simmons v. Massanari*, 264 F.3d 751, 754; 20 C.F.R. § 416.920(a)(4)). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to

do basic work activities." *Id.* at 707. "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two." *Id.* (citing *Page v. Astrue,* 484 F.3d 1040, 1043 (8th Cir.2007)). "It is the claimant's burden to establish that his impairment or combination of impairments are severe. *Id.* (citing *Mittlestedt v. Apfel,* 204 F.3d 847, 852 (8th Cir.2000)). "Severity is not an onerous requirement for the claimant to meet, . . . but it is also not a toothless standard." *Id.* at 708.

The Court finds that the ALJ properly considered Borgard's complaints of fatigue. In his decision, the ALJ notes that laboratory studies were done to determine the cause of Borgard's fatigue, including thyroid, renal function, and blood tests. (Tr. 16.) Dr. Speiser reported that Borgard's fatigue was of an unclear etiology. (Tr. 16.) Borgard does not point to any evidence in the administrative record that demonstrates her fatigue would more than minimally affect her ability to work. The effects of fatigue could be extremely mild or disabling, but the mere presence of the fatigue as a side effect is insufficient to establish that it rises to the level of a severe medically determinable impairment. Accordingly, the Court finds that Borgard's argument lacks merit.

Finally, Borgard contends that the additional evidence she submitted to the Appeals Council after the ALJ's decision supports the conclusion that she suffers from disabling degenerative joint disease of the cervical spine with stenosis and degenerative arthritis of the lumbar spine. (Pl.'s Br. 13.) "In cases involving the submission of supplemental evidence subsequent to the ALJ's decision, the record includes that evidence submitted after the hearing and considered by the Appeals Council." *Bergmann v. Apfel*, 207 F.3d 1065, 1068 (8th Cir. 2000) (citing *Jenkins v. Apfel*, 196 F.3d 922, 924 (8th Cir. 1999). "In such a situation, "[a] court's role is to determine whether the ALJ's decision 'is supported by substantial evidence on

20

the record as a whole, including the new evidence submitted after the determination was made.'"
*Id.* (citing *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994)).  "In practice, this requires [a] court
to decide how the ALJ would have weighed the new evidence had it existed at the initial
hearing."  *Id.* (citing *Riley*, 18 F.3d at 622).  Thus, the appropriate inquiry is not whether the
Appeals Council erred, but whether the record as a whole supports the decision made by the
ALJ.  *Perks v. Astrue*, No. 11-3041, 2012 WL 3168495, at *5 (8th Cir. Aug. 7, 2012) (citing
*Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000)).

In this case, Borgard submitted an MRI, and EMG (suggests bilateral tarsal tunnel
syndrome), and two reports to support her contention that the ALJ's decision was not supported
by substantial evidence.  Upon review of the evidence, the Court fails to see how the additional
evidence contradicts the ALJ's decision that Bogard is not disabled.  The ALJ determined that
Bogard's degenerative joint disease of the cervical spine with stenosis, degenerative arthritis of
the lumbar spine, and osteoarthritis of the knees were severe medically determinable
impairments.  (Tr. 14.)  Bogard does not state how the evidence she submitted, including the
EMG suggesting she may have bilateral tarsal tunnel syndrome, would constitute substantial
evidence with the record as a whole that she is disabled.  Based on the ALJ's decision and the
new evidence, the Court finds that the ALJ's decision would have remained the same despite the
new evidence.

## VI.    Conclusion

Based on the foregoing, the Court finds that the ALJ's decision is supported by
substantial evidence in the record as a whole and the decision will be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by Claimant in her Complaint and

Brief in Support of Complaint is **DENIED** and that judgment is entered in favor of Defendant.

[Docs. 1, 11]


Dated this 27th day of September, 2012.


/s/ Jean C. Hamilton
JEAN C. HAMILTON
UNITED STATES DISTRICT JUDGE

22